IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

REGENCY HOSPITAL COMPANY OF
NORTHWEST ARKANSAS, LLC                                                          PLAINTIFF


V.                           NO. 4:08-CV-04177 GTE


ARKANSAS BLUE CROSS AND BLUE
SHIELD, A MUTUAL INSURANCE COMPANY                                               DEFENDANT


ARKANSAS BLUE CROSS AND BLUE SHIELD'S
MOTION TO DISMISS, OR IN THE
ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Defendant Arkansas Blue Cross and Blue Shield, A Mutual Insurance Company ("ABCBS"), for its Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, states:

1. Plaintiff Regency Hospital Company of Northwest Arkansas LLC ("RHC"), brought this lawsuit to recover benefits allegedly due under group health insurance issued by ABCBS or under health benefit plans administered by ABCBS or affiliates of ABCBS covering eight beneficiaries of employee welfare benefit plans.

2. In its Complaint, RHC alleges (a) that it provided medical services to each of these eight health plan beneficiaries, (b) that prior to providing these services, RHC contacted ABCBS to "verify the health insurance benefits available to each individual patient," (c) that ABCBS "provided the amount of health insurance benefits that were available to each patient," (d) that RHC "calculated the amount of benefits it expected to receive for the treatment provided

1

to the patients," and (e) that ABCBS either underpaid or did not pay RHC for the treatment provided, in the amount of $730,993.30.

3. The essence of RHC's Complaint is that the amount that was paid for reimbursement on each of these claims is different than what RHC expected after RHC called ABCBS's customer service representatives to "verify benefits." RHC alleges that ABCBS is "estopped" to act contrary to the statements of ABCBS's customer service representatives[1], and that ABCBS is liable to RHC under the state law theory of promissory estoppel.

4. RHC further alleges in its Complaint that each of the eight patients assigned their claims for benefits to RHC, and that ABCBS is subject to a statutory penalty, interest and attorneys fees for failure to pay these claims.

5. The health benefits at issue in this case were made available and provided pursuant to or in connection with employee welfare benefits plans. Except in one case, ABCBS either issued a group health insurance benefit certificate to the plan beneficiary or acted as claims administrator for a "self-funded" plan. In one of the cases referred to in RHC's Complaint, ABCBS has no record of issuing health insurance or acting as claims administrator for the plan.

6. The benefits that RHC seeks to recover from ABCBS by way of assignment were provided pursuant to or in connection with employee welfare benefit plans that are subject to the provisions of the federal Employee Retirement Income Security Act ("ERISA"), 29 USC §1001, et seq.

---

[1] For the purposes of this Motion only, ABCBS will refer to the Complaint's allegations of various alleged customer service representatives' statements as the statements of ABCBS representatives; in fact, because at least one of the plan beneficiaries involved was covered under a self-funded health plan for which a separate company (but an ABCBS affiliate) provides third party administration services, the statements in question may have been made by a customer service representative of such affiliate.

7. To the extent these claims for benefits are subject to ERISA, RHC's claims under state law, including the claims for promissory estoppel and a statutory penalty, are completely pre-empted, and RHC's sole remedy is pursuant to 29 U.S.C. §1132.

8. Because RHC's state law claims are completely pre-empted, RHC's Complaint should be dismissed because RHC has not stated a claim for relief under ERISA.

9. Alternatively, even if RHC had properly stated a claim for benefits under 29 U.S.C. §1132 of ERISA, ABCBS is entitled to judgment as a matter of law. As set forth in the affidavits of Peggy House and Victoria Charlesworth submitted in support of this Motion, all the benefits that were due under the terms of ABCBS's health insurance benefit certificates or under the terms of the plan benefit documents as to which ABCBS or its affiliates acted as claims administrator were paid. Because all the benefits that were due were paid, RHC's lawsuit must be dismissed.

10. Finally, and in the alternative, even if -- or to the extent that -- RHC's promissory estoppel claim is not pre-empted by ERISA, RHC's Complaint should be dismissed because (a) RHC's claim is based on an existing, enforceable contract, (b) ABCBS did not make -- and RHC has not alleged that ABCBS made – a promise to RHC, (c) RHC did not rely to its detriment on any alleged promise by ABCBS, and (d) no reasonable finder of fact could find that RHC's reliance on ABCBS's alleged promise was reasonable.

11. For these reasons, RHC's Complaint should be dismissed for failure to state a claim pursuant to Fed.R.Civ.Proc. 12(b)(6). Alternatively, RHC's Complaint should be dismissed because there are no material facts in dispute and ABCBS is entitled to judgment as a matter of law.

12. In support of its Motion, ABCBS submits the Affidavits of Victoria Charlesworth, Peggy House, and Warren McDonald, and excerpts from the depositions of Mike McLean and Patricia Jones, which are attached hereto as Exhibits A and B, respectively.

WHEREFORE, Arkansas Blue Cross and Blue Shield prays that Plaintiff's Complaint be dismissed with prejudice and that Arkansas Blue Cross and Blue Shield recover its costs and attorneys fees herein.

> ARKANSAS BLUE CROSS AND BLUE SHIELD,
> A Mutual Insurance Company,
> Defendant
>
> By Its Attorneys:
>
> Allan W. Horne
> Mark H. Allison
>
> DOVER DIXON HORNE PLLC
> Suite 3700, 425 West Capitol Avenue
> Little Rock, AR 72201
> Ph: (501) 375-9151
> Fax: (501) 375-6484
> mallison@ddh-ar.com
>
> By: _____
> Mark H. Allison
> Arkansas Bar No. 85001

## CERTIFICATE OF SERVICE

    I hereby certify that on September 11, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following:

Tim Cullen
CULLEN & CO., PLLC
P.O. Box 3255
Little Rock, Arkansas 72203

and, further, that a copy of the foregoing has been served upon Ronald Hennings, LAW OFFICE OF RONALD J. HENNINGS, P.C., 3755 East Main Street, Suite 175, St. Charles, IL 60174, by placing a copy in the United States mail addressed to such attorney with sufficient prepaid postage, this 11th day of September, 2009.

                                                */s/ Mark H. Allison*
                                            Mark H. Allison

**REGENCY HOSPITAL COMPANY OF NORTHWEST ARKANSAS LLC**

V.

**ARKANSAS BLUE CROSS AND BLUE SHIELD**

U.S.D.C., E.D. Ark. No. 4:08CV04177 GTE

ARKANSAS BLUE CROSS AND BLUE SHIELD'S
MOTION TO DISMISS OR IN
THE ALTERNATIVE FOR SUMMARY JUDGMENT

# EXHIBIT A

# EXCERPTS FROM THE DEPOSITION OF MICHAEL MCLEAN

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| REGENCY HOSPITAL OF NORTHWEST ARKANSAS, LLC, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | NO.:4: 08CV4177GTE |
| ARKANSAS BLUE CROSS AND BLUE SHIELD, | ) ) ) ) | |
| Defendant. | ) ) | |

DEPOSITION OF MICHAEL McLEAN

Taken at Lundy & Davis, 300 North College Avenue, Suite 309, Fayetteville, Arkansas  72701, on August 31, at 1:03 p.m.


APPEARANCES

MR. TIM CULLEN                             FOR THE PLAINTIFF
Cullen & Company, PLLC
P.O. Box 3255
Little Rock, Arkansas   72203
(501) 370-4800

MR. MARK H. ALLISON                        FOR THE DEFENDANT
Dover Dixon Horne, PLLC
425 West Capitol 37th Floor
Little Rock, Arkansas   72201
(501) 375-9151

1   number of years, I had psychiatry coverage at Fayetteville
2   and did not have psychiatry coverage at Springdale, so if
3   we would have a patient who needed a psychiatrist and they
4   were in Springdale, we might transfer them to
5   Fayetteville. But typically, we try not to do that.
6   Q.   Okay. In a situation like that, would you consider
7   that to be the same admission?
8   A.   I would.
9   Q.   Are the billings that are generated from the two
10  facilities different?
11  A.   That would be a question for the central business
12  office, but my understanding is they are different.
13  Q.   So billings for patients that come out of the
14  Fayetteville facility would show Regency Hospital Company,
15  Fayetteville. The ones that come out of the Springdale
16  facility would indicate that they were at the -- at the
17  Springdale facility?
18  A.   That's my understanding, but again, our central
19  business office would be the correct --
20  Q.   Okay. Now, after the clinical criteria is
21  evaluated, you said the next step in the admission process
22  was to verify financial information?
23  A.   Correct.
24  Q.   Okay. Tell me how that works?
25  A.   Well, basically, our admissions coordinator will

1  send our corporate office the insurance information where
2  they'll do a verification of the benefits.  Once they
3  verify that there are benefits, they'll get back with them
4  and we go forward with obtaining a preauthorization or
5  whatever is required by the -- the insurance companies.
6  Now, if you're dealing with Medicare -- let's start there,
7  since that's the majority of my business.  With Medicare,
8  they'll -- the central business office will confirm that
9  there's benefits and what benefits are, and basically upon
10 that time they move to the next step.  If it's an
11 insurance company that requires preauthorization, then the
12 admissions coordinator will work on getting a
13 preauthorization number.  So it depends on the payor.
14 Q.    Who makes the final decision about whether to admit
15 a patient?
16 A.    The decision -- final decision in either of my two
17 hospitals, I make.
18 Q.    Okay.
19 A.    There obviously are criteria.  There's obviously
20 protocols.  And I won't be contacted and/or asked to look
21 at anything unless it falls outside some pre-established
22 criteria.
23 Q.    So -- and I don't want to put words in your mouth,
24 but would it be fair to say that even though the final
25 decision about admission rests with you, there may be

1  several or many instances in which you don't make an
2  actual decision because the patient falls within the
3  criteria for admission?
4  A.   Let me say it very clearly.  With the majority of
5  Medicare patients, I don't know a thing about it.  With
6  the majority of insurance patients, I don't know a thing
7  about it.  If they have benefits and they meet the
8  clinical criteria, then I don't know anything about it.
9  So when would my staff consult me?  I'm going to
10 anticipate your question, sir, and just go ahead and
11 answer that.
12      I would be consulted if, for an example, a patient
13 was indigent and the referring physician wanted me to take
14 a patient with no payment whatsoever.  I would be
15 consulted if a patient were out of Medicare days or close
16 to being out of Medicare days.  So I'm going to be
17 consulted for the exceptions, not the routine.
18 Q.   In the routine situation, then, is it up to the
19 admissions coordinator to make the call on whether the
20 facility's going to take a patient, as a practical matter?
21 A.   As a practical matter, the director of business
22 development's going to make that call.  And so a typical
23 scenario would be we'd verify that a patient meets the
24 intensity of service and the severity of illness, they
25 have Medicare days, then basically, the physician is going

Page 53

1  to be the one who practically makes that decision because
2  that patient, then, will be presented to that physician,
3  their clinical picture described, and the physician, then,
4  based upon that clinical picture will decide, Yes, we're
5  going to admit the patient or No, we're not going to admit
6  the patient.
7  Q.    When you say the "physician," which physician would
8  that be?
9  A.    Well, it would be -- in Fayetteville we have -- at
10 this time, we have two physicians that we work with, Dr.
11 Mark Thomas and Dr. Mike Molten.
12 Q.    Well, I'm not quite sure I understand, so let me go
13 back and --
14 A.    Sure.
15 Q.    -- and try to clarify this a little bit more.
16 A.    Sure.
17 Q.    You said, I believe, that the director of business
18 development would verify the intensity of services and
19 severity of illness?
20 A.    Okay.
21 Q.    And then would also verify whether the patient has
22 Medicare days left in a Medicare situation?
23 A.    Okay.
24 Q.    Correct?
25 A.    Well, he won't personally do that, but individuals

1   working with him will, yes.
2   Q.   And he would have that knowledge?
3   A.   And -- yes. He'll be given that information, and
4   then if the patient meets those criteria, the patient will
5   be presented to the physician. You know, we're a
6   hospital, and so the final decision's always going to be
7   with the physician. Physician's the captain of the ship.
8   Q.   But if the patient doesn't meet those criteria and
9   you don't give the decision, for example, to accept an
10  indigent patient, then --
11  A.   The patient's not presented.
12  Q.   -- the patient's not presented to the physician for
13  admission?
14  A.   That's correct.
15  Q.   Is that correct?
16  A.   That is correct, sir.
17  Q.   Okay. Now, what are the financial criteria in the
18  case of private insurance that affect whether your
19  admissions coordinator or your director of business
20  development has the authority to decide whether to present
21  a -- a patient to a physician for admission?
22  A.   If I understand your question, your question was
23  what are the financial criteria for a private insurance
24  that the director of business development looks at before
25  he accepts or doesn't accept?

1  Q.    That's correct.
2  A.    And the answer is, whether or not the insured has
3  benefits.
4  Q.    Okay.
5  A.    So if a patient is verified as having United Health
6  Care insurance and we verify that that contract or that
7  policy is in effect, then once we get an pre-authorization
8  number, we admit the patient.  So to the best of my
9  knowledge, in Northwest Arkansas, my director of business
10 development does not rank which insurance company pays the
11 best and then takes those patients first.  And the main
12 reason is that we are typically not full.
13 Q.    Okay.  So typically you have excess capacity?
14 A.    Typically I have an empty bed.
15 Q.    Okay.  Are there any written policies or manuals or
16 guidelines about patient admission at Regency's Northwest
17 Arkansas hospitals?
18 A.    Please ask that question one more time.
19 Q.    Are there any written policies or manuals or
20 guidelines relating to patient admission at Regency's
21 Northwest Arkansas hospitals?
22 A.    I'm not sure whether there are or not.  I don't
23 know.
24 Q.    You're not aware of any?
25 A.    I'm not, but that doesn't --

**REGENCY HOSPITAL COMPANY OF NORTHWEST ARKANSAS LLC**

**V.**

**ARKANSAS BLUE CROSS AND BLUE SHIELD**

**U.S.D.C., E.D. Ark. No. 4:08CV04177 GTE**

ARKANSAS BLUE CROSS AND BLUE SHIELD'S
MOTION TO DISMISS OR IN
THE ALTERNATIVE FOR SUMMARY JUDGMENT

# EXHIBIT B

# EXCERPTS FROM THE DEPOSITION OF

# PATRICIA JONES

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

REGENCY HOSPITAL OF
Northwest ARKANSAS LLC,

        Plaintiff,

vs.                      NO. 4: 08CV4177 GTE

ARKANSAS BLUE CROSS AND
BLUE SHIELD,
       Defendant.
-------------------------


DEPOSITION OF

PATRICIA JONES

August 25, 2009
2:15 p.m.

Suite 200
11175 Cicero Drive
Alpharetta, Georgia

S. Julie Friedman, CCR-B-1476

1   about, you know, if, if --
2           And it's more directed towards Medicare,
3   too, instead of your commercial; but it -- You know,
4   it will direct you towards how you determine if a
5   Medicare patient, who's primary if they have a
6   secondary insurance or a spouse working, you know,
7   just the typical kind of things that you need to know
8   about billing.
9           It's not a coding class or a coding
10  requirement certification, because that's very, very
11  different.
12          How to determine how many days a patient
13  has in a Medicare benefit period. Like I said, it's
14  geared toward government billing than, you know, your
15  nongovernment billing; but most insurance companies
16  follow the same guidelines as Medicare.
17      Q.   Now what does that mean?
18      A.   As far as they use the same revenue codes,
19  they use the same CPT codes, they use the same HCPCS
20  codes. They use the -- Everybody's required to bill
21  on a standard UBL4 form. It used to be a UB92. It's
22  all been standardized.
23      Q.   Why do insurance companies follow what
24  Medicare does?
25      A.   Well, they just do. Medicare kind of sets

1   the tone as to how everybody's going to -- how, you
2   know --  Just like I said, they use the same revenue
3   code, the same HCPCS code.  It's standardized.
4           In fact, Federal Registry, all the
5   insurance companies were supposed to use the same
6   billing guidelines, as set forth in the Registry.
7   Some of your bigger insurance companies have not yet
8   changed their billing requirements, but supposed to
9   be mandated last year, but some of them still don't
10  do it.
11      Q.    When you say the Federal Registry, what is
12  that?
13      A.    The Federal Registry sets forth all the
14  guidelines set by legislation.
15      Q.    Are you referring to "The Federal
16  Register"?
17      A.    Yes.
18      Q.    Okay, okay.  Okay.  The government
19  regulations --
20      A.    Yes.
21      Q.    -- publication?
22      A.    Yes.
23      Q.    All right.  Okay.  Now when you were
24  working for the Atlanta Eye Surgery Group, did that
25  group get paid based on UCR or a DRG methodology?

1    A.    They get paid on fee for service.
2    Q.    Fee for --
3    A.    Neither one.
4    Q.    -- service.
5    A.    Okay.
6    Q.    Neither one.  What's the difference
7  between a fee for service --
8    A.    Well, a fee for service --
9    Q.    -- and UCR or DRG?
10   A.    Well, outpatient is still not paid on a
11 DRG.
12   Q.    Okay.
13   A.    So outpatient, all your physicians are
14 typically paid on a fee for service, so they don't
15 necessarily get paid charges.  Some insurance
16 companies will pay you on charges, but most of them
17 will pay you on some kind of fee schedule.
18   Q.    And that fee schedule is tied to some sort
19 of service code?
20   A.    A CPT code.
21   Q.    A CPT code.  All right.  So are you saying
22 that hospitals are paid using a DRG methodology?
23   A.    Now they are.  We are.
24         When I first started working with LTACs,
25 we were paid on cost plus a TEFRA.

1   Q.   What is a TEFRA?
2   A.   Well, it's you get rewarded if you can
3   keep your costs down, so there was a baseline of, you
4   know, If you -- Say, for instance, your average cost
5   per patient is $24,000, so depending on where you
6   fell in that range, you would get an extra 8 -- 5 to
7   10 percent, plus your cost.
8   Q.   And is that the way LTACs are paid down?
9   A.   No.  They're paid on a DRG or the PPS.
10  Q.   And what is a PPF --
11  A.   PPS.
12  Q.   -- PPS?
13  A.   It's -- it's the -- It gets down to it's
14  a DRG.
15  Q.   All right.  Okay.  In fact, wasn't there a
16  rule making in 2002 or maybe 2001 where Medicare
17  shifted and put all LTACs on a DRG reimbursable --
18  A.   November 2 --
19  Q.   -- methodology?
20       (Discussion ensued off the record.)
21       MR. ALLISON:  Reimbursement methodology.
22       THE COURT REPORTER:  And then the answer?
23       THE WITNESS:  It's December 1, 2002.
24  Q.   (By Mr. Allison)  December 1, 2002.  And
25  explain to me what that regulation did?